Good morning, ladies and gentlemen. Our first case for this morning is Kemper v. Deutsche Bank. Mr. Ravenhansen. Good morning, Your Honor, and may it please the Court, my name is Peter Ravenhansen. I represent Rhonda Kemper, the plaintiff appellant, in this appeal from the District Court's dismissal of the complaint for failure to state a claim. There's no dispute that the plaintiff has plausibly pled that Iran engaged in a conspiracy to conceal and disguise bank payments in order to access the international financial system for the purposes of financing its illicit activities of terrorism and proliferation. That's a long sentence for the whole thing to be undisputed. I understood that parts of it are not disputed. For example, Bank Melli is an agency of the Iranian government, just to take one. But all the way out to the end of that chain, I thought, was actually what we're here to discuss. Well, the dispute is whether the bank entered into that conspiracy or engaged in an entirely separate conspiracy when it engaged in the same concealing and disguising techniques with the same Iranian banks over the same time period. But I don't think there's any dispute about Iran's conspiracy. Let me start you off with this. With the addition in JASTA of 2333d, the statute provides an explicit subsection of cases under which conspiracy and aiding and abetting liability can be asserted. Doesn't that establish that such secondary liability would not be available in cases that do not fall within that provision? Because otherwise, wouldn't 2333a completely swallow 2333d, such that it would have no independent significance? Your Honor, I don't think so, because, first of all, Congress was aware of this court's en banc decision in BOEM III when it enacted JASTA, and it expressly stated in the purpose provisions of the JASTA legislation that the purpose was to expand liability, not to contract it in any way. And they expanded it by codifying common law secondary liability, the common law secondary liability that this court rejected in BOEM III. But BOEM and Rothstein and Owens all hold that secondary liability, including aiding and abetting or conspiracy liability, is not available under 2333a, except as provided under 2333d. So it almost seems as if you're asking us to reject those holdings. No, Your Honor. What Congress did was add another theory of liability by enacting 2333d. It still left in place primary liability with a theory of secondary liability for instances where attacks are not caused by a foreign or planned, authorized, or committed by a foreign terrorist organization, for example. And here the defendant challenges our view that EZBOLA was responsible for the attack. It says it was the initiative of local thugs acting as special groups. So this is an instance where the plaintiff would plead both the BOEM III theory of primary liability and JASTA 2333d, depending on what the fact finder would find with respect to the planning and authorization of the attack by a foreign terrorist organization. Also, Congress surely intended to leave primary liability for terrorists. In other words, it's impossible to think that they have completely supplanted the preexisting liability with Section 2333d. But that's a long way, though. I mean, this is what was worrying the Rothstein court, what was worrying the lower court. To say that Deutsche Bank agreed with these two instrumentalities of the Iranian government, that they were going to evade the U-turn, they were going to clear dollar-denominated transactions through New York, strikes me as a far cry from saying that Deutsche Bank agreed with the U-turn. They agreed to fund Hezbollah's activities, for example. The straightforward explanation is that they wanted to make money and they didn't really care what Iran was doing with the money once they got those dollars in Iran's possession. So I'm worried that we're collapsing too much into your phrasing of this. Certainly, as the district court said, Deutsche Bank is not behaving in a commercially honorable way to avoid these sanctions, but to go further. And you're equating the word conspiracy with the word agree for the financial institutions, and I'm worried about that. Well, Your Honor, I appreciate that. But what Deutsche Bank is really arguing is, yes, we conspired with these banks to strip – Well, let me suggest at least four reasons why we plausibly pled that there is something not only in agreement but beyond the agreement. First of all, Deutsche Bank argues that it was simply trying to expedite transactions that might otherwise be rejected and therefore have to be resubmitted between non-Iranian banks. Do you concede that a great number of these transactions, I think all but about 600, could have been done legitimately? They weren't, but could have been? Well, we've never understood quite, and the bank has never made clear what it means by legitimately here. Through the transparent, without deleting the source information, without tampering with the SWIFT messages and so on. That's what I mean. We can't concede that because the bank's numbers are entirely self-reported and have never been confirmed. We can only take them as their allegation. What we can infer from their emails as reflected in the consent order with the New York Department of Financial Services is that they weren't worried just about the money being rejected, but about it being frozen in the United States. Now, the United States only freezes funds that are from specially designated nationals. We also know that when the New York branch of Deutsche Bank said, wait a minute, you're dealing with U.S. designated entities and that breaks the law, the bank's response was to hide the ball from them and basically put them in the dark. And these are phrases from the consent order, not my phrase. By re-channeling the money, they put it actually in something they euphemistically called a repair queue and then sent it around the New York objections. So there is actually a… Are you worried about timing for when these institutions were designated, SDNs or SDGTs? The banks, the two Iranian banks they dealt with were designated in 2007 and 2008, but Ebola was designated in 2001, as were many of the individual members. That's several steps further down the chain, of course. Yes, it is. But one other bit of evidence that we think makes it plausible to believe that the bank agreed and knew that there was a substantial probability that the money would reach Ebola and the IRGCQF is that it engaged in exactly the same deceptive techniques with exactly the same Iranian banks over exactly the same time period that the United States found that those banks gave $150 million to Ebola and the IRGCQF. Which is Iran's terror arm in Iraq. The bank says that's coincidence and it is a separate conspiracy. And we say no, that's a reasonable basis for a fact finder to infer that the two conspiracies interlinked and that the deceptive techniques that the bank used were the same deceptive techniques that its two counterparts used when they funded Ebola and the IRGCQF. I want to make sure I'm clear. You are accusing Deutsche Bank of directly funding Hezbollah, just as in Boehm we had direct funding of Hamas? We are drawing an inference which we think is plausible that in using deceptive techniques with the only two banks that are mentioned in the consent order, Bank Saderat and Bank Melli, banks which the government found used the same deceptive techniques at the same time. But that's not Deutsche Bank. I mean Bank Melli and Bank Saderat are instrumentalities of the Iranian government. Yes, but they're the ones that Deutsche Bank dealt with. The consent order only mentions two banks. I mean the bank has made a point of it involving Burma and Syria and Libya. But come on, 11 of the 12 pages mention Iranian counterparts and the only two banks mentioned in the consent order are Bank Saderat and Bank Melli. Is it a coincidence that the same two banks, using stripping and cover transactions in the same time period, funded Hezbollah and the IRGCQF? The fact finder would be entitled to determine whether that's coincidental, but I also think it's plausible that it's not a coincidence. Can I ask you, I mean let me ask you two questions, and they're different. One of them is whether in order to rule for you we would need to create a split with Rothstein and with Owens. And the other question is, in the chain, Deutsche Bank has money A to B to C to D to E. Is there any outer limit in the law that you see? Or as long as you can keep following down a long chain, do you have a claim stated in your view under these statutes? Well, that's a long double question, so let me take a minute to answer. You can take them in whichever order you prefer. Let me start with Rothstein. Rothstein was not a conspiracy case. It was an aiding and abetting case. And the focus of causation in an aiding and abetting case is on the substantial assistance that the aider and abetter gave to the primary tortfeasor. And therefore using the substantial factor test for causation makes eminently good sense. Your measuring is the assistance that the aider and abetter gives to the tortfeasor. The primary tortfeasor is substantial. In a conspiracy case, the focus is on agreement. If the defendant is viewed to have agreed with the co-conspirators, then it's liable for any overt act that the co-conspirators approximately caused, you know, foreseeably. It was basically foreseeable. Yes. And so substantial factor is not the test for a conspiracy case. The other distinction with Rothstein is that Rothstein had no non-conclusory allegations that any of the bank's counterparts, or that Iran, had actually transferred money to the foreign terrorist organization. We have the United States government finding that $150 million went by the same two banks that Deutsche Bank happened to be working with, went from them to the foreign terrorist organization. So what was not present in the Rothstein complaint is plausibly pled in this complaint based on the United States government finding. Owen is a difficult case because as both the district court and the court of appeals observed, the complaint was not a model of clarity. I went and looked at it and it has 24 counts. They're all for assault and battery, intentional infliction of emotional distress, and loss of consortium. So it's hard to know what exactly they were pleading. But apparently, according to the D.C. Circuit opinion in the case, their briefing and their argument was on aiding and abetting. And again, if aiding and abetting is your theory of liability under the BOEM III primary liability with the character of aiding and abetting, then the focus is on substantial assistance. And the correct test is, was the defendant's acts a substantial factor in the natural chain of causation? That court also held that common law aiding and abetting and conspiracy was not available, which we don't disagree with. We're not asserting a common law theory. We're asserting a BOEM III theory. So neither case actually deals with conspiracy. There's no discussion in Owen's or in Rothstein of Pinkerton and conspiracy because they both were ultimately treated as aiding and abetting cases. In reading the briefs, here's something I've been wondering about. Even if the criminal law prohibiting material support is conceptually similar to an aiding or abetting or conspiracy theory, how would that support imposing civil conspiracy principles to 2333A as opposed to considering criminal conspiracy principles in evaluating whether the violation of international law was shown? I'm not certain I understand your Honor's question. We're not dealing with a violation of international law for one thing, but I would say that we are espousing a theory. It is a violation of international law. It's a fact. It is as well, but that's not the allegation in the complaint. This is strictly claims under the Anti-Terrorism Act. And our theory of liability originally pre-JASTA was that the bank was primarily liable on a theory of conspiracy. And we were following the unbanked decision of this court in BOEM III in articulating that theory. As we pointed out, there are some distinctions between the BOEM III scenario. Let me just quickly ask you one more thing before you sit down. And that's really dealing with the tort doctrine of intervening cause. It's another thing that comes up here where the district court and other courts have said, sure, maybe Deutsche Bank is giving money to Iran, but Iran is a sovereign state. They do a lot of things. They build roads. They have hospitals. They have other things. Maybe they support Hezbollah and they develop EFPs, too. But their intermediate decision breaks the chain of causation, the theory would be, if that's the case. So why doesn't giving money—I mean, it would be like giving money to the United States and saying that we're a terrorist country because we financed the killing of Osama bin Laden. Well, the United States does a lot of things. It does plenty of things other than kill Osama bin Laden, although we did that. So why isn't sending the money to a sovereign state something that's a sufficiently intervening cause that we can't get the rest of the way down your causal chain? I'm into my rebuttal time, but if I may be permitted to answer that, I will. That's fine. First of all, Iran has a channel for its legitimate activities, which is the U-turn regulation. So when they deliberately bypass that, the natural inference is that they are using it to support illicit activities. And if your honors would look at paragraph 138 of the complaint, you'll see that that's precisely what the United States Treasury concluded when it rescinded the U-turn regulation. It said that Iran was using deceptive bank techniques to access the international financial system for the purposes of financing its illicit activities, those being terrorism and proliferation. The other answer, your honor, is that if any co-conspirator has proximately caused the injury to the plaintiff, then all co-conspirators are liable, provided that it's foreseeable. And in furtherance of the conspiracy, in answer to your honor's question earlier about the chain, foreseeability is the control in the chain. If Deutsche Bank had given $100 in 1996, then even if we show the conspiracy that we've alleged, it arguably would not be liable for an attack in 2009. But we're dealing with a minimum of $38 million and maybe more within a few years of the attack. Thank you. I'm not sure how you pronounce your name, Mr. Zianz? Zianz, thank you, your honor. And may it please the court, David Zianz for defendant Deutsche Bank AG. I'm going to start you right out following Mr. Raven-Henson's last remarks, because given the availability of the U-turn for legitimate transactions, isn't the failure to adhere to those requirements evidence that the transactions involved an illegitimate purpose? And isn't the deliberate removal of identifying information a fairly clear effort to hinder the investigation and interception of that obviously illegitimate purpose? Your honor, I would say that there's certainly a fair inference here that there was something improper. Deutsche Bank has agreed with banking regulators to a civil consent order that these were not appropriate banking practices. And I think you could even take it a step further and reach an inference that there was some intent to avoid sanctions. At the time of this, as Judge Wood pointed out, during the time that the consent order was focused on, Bank Melly and Bank Sedera were not designated entities. The U.S. government had not announced to the world that there was a concern about these entities funding terrorism. What President Clinton had done in the 1990s is imposed a general embargo on Iran. Now, the U-turn exemption was a partial limitation on that embargo. There was a way where money was coming into the country just to come out of it where there was not an Iranian or U.S. party on either side directly of the transaction. And then there was a broader category of transactions. For example, if the money was coming through from an Iranian company through Deutsche Bank and the end result was not U-turning out but was ending in the United States, that would have violated the U-turn exemption. And certainly, I think you can infer an intent to avoid that overall sanctions regime. But I think it's a step too far to infer an intent essentially to fund terrorism, which is what's being alleged here. So here's my question. I don't think that the line of causation is necessarily as long as you portray it in your briefs, because it seems to me it's just a couple of steps. We have Deutsche Bank doing business for Iran. And we know from sources such as the Foreign Sovereign Immunities Act and others that the government of Iran and Bank Mali and Bank Sadrat are one and the same. They both partake of the foreign sovereign. And so we have a middle package that's really just Iran, whether it's the Iranian banks, whether it's the shipping line, whether it's the IRGC or IRGCQF. So Deutsche Bank is dealing with this intermediate step. And by the time you get to IRGCQF, they are clearly funding Hezbollah, which is developing these lethal weapons. And the end result is the predictable killing of Americans. They were very upfront about that goal, actually. It wasn't something they thought necessary to hide. So if Deutsche Bank is engaged in that transaction, shouldn't we impute to them knowledge that anybody reading the newspapers would have? Your Honor, I think it would certainly be fair to debate exactly how many steps there are in the chain. And if it's a shorter chain, your approximate cause argument doesn't sound as good. Your Honor, I think at a bare minimum, even if you're prepared to sort of loop together the special groups, Hezbollah, the IRGCQF, the IRGC, Iran, Bank Mali, even if that is all together. And the government and the bank. I mean, I see that as all Iran and its agents. Right. Right. I think, you know, as Your Honor noted earlier, however short or however much you can package some of these entities, you still have a sovereign government in the middle. This case is very similar to Owens, of course, on this court. But the allegations are almost identical where you had a state sponsor of terrorism. You had a bank that was alleged to have been deceptively processing transactions for that government and for its banks. And what the D.C. Circuit explained is that is not directly giving money to terrorists. That is supplying resources to a state sponsor of terrorism, certainly understanding that that is one of the many things that that state sponsor of terrorism does. But that is still a very significant break in the chain or at least a significant step that makes it not a sufficiently direct relationship for purposes of proximate cause. I was just going to say, does that make sense if it's a government such as the government of Iran during this time, which has announced that it's doing this, which the president of the United States branded as part of the axis of evil. I mean, surely this is more than just idle talk on the president's part. He, you know, I don't know all the information he had behind that statement, but he lumps together a very small number of countries and Iran is one of them. And so it's not just such an innocuous act for Deutsche Bank to find a way to pour money into the Iranian coffers when Iran has said we're going to kill people from the United States. Your Honor, I'm certainly not here to maintain that this was an innocuous act. The United States imposes very significant sanctions on Iran. In this case, what Iran, what Deutsche Bank was found to have done, admitted to doing, was non-transparent. And they got a slap in the wrist for that, really. $36 billion as compared to $200 million. It's a little tax. It's a 2 to 3 percent tax. Your Honor, I think, you know, there was a broad settlement with both, with banking regulators at the New York and the federal levels. There was, in addition to a significant fine of a few hundred million dollars, Deutsche Bank committed to putting processes in place, a monitor to show that it was repairing issues in its compliance system. So I don't think this was a minimal slap on the wrist. But I think, you know, the broader point here is there is a difference between non-transparent banking regulations and even ones with a state sponsor of terrorism, even where there's some evasion of sanctions. Can I just subject to your euphemism non-transparent bank? I mean, these are deliberate evasive measures, is what you're talking about. Sure, Your Honor. It's worse than just non-transparent, which many people would accuse all banking regulations of being non-transparent. Sure. And Your Honor, to be clear,  That was the specific violation that was found by the New York State Department of Justice. Certainly, again, we're here taking the consent order as true. There were sort of evasive maneuvers here. And you could even stipulate that there was a purpose to evade sanctions, which was a very broad-based sanctions regime. But I think, to zoom out a little bit, the conspiracy claim that's being alleged here, I think there's agreement. Holding aside whether this conspiracy theory works, which we're going to get back to, because of the difference between subsection A and subsection D. But let's assume that if they can show a conspiracy to fund terrorism, then Deutsche Bank can be on the hook for something any of its alleged co-conspirators have done. The essence of a conspiracy is an agreement, but not just any agreement. It's an agreement to do the object of the conspiracy. The plaintiff here has argued that Halberstam should supply the standard. And we disagree with that for reasons we've explained in our brief. But let's suppose that Halberstam is the standard. At 705 F. 2nd 481, the D.C. Circuit talks about what you need to do. You need to be able to infer that the alleged joint tortfeasors are, quote, pursuing the same goal. So the claim here can't just be you have the goal of helping Iran get around sanctions and you knew foreseeably that that might help them fund terrorism. You need to show, for there to be a conspiracy to fund terrorism, any participant in that conspiracy needs to have agreed to that objective. And there's just nothing there. That agreement can be inferred. One of the examples I think in the briefs, or at least one of the examples that comes to my mind, is a drug conspiracy where one person is approached by an individual he knows and say, oh, we see you have a garage with lots of room in it. Do you mind if we store large boxes in the garage? And we'll pay you a lot of money. You know, we'll pay you $1,000 a month for your garage storage space. So the second person says, sure. And the second person thinks, well, it's a little fishy, you know, $1,000. But actually, of course, it's the drugs in the box. And people like that have been found guilty of being part of a drug conspiracy. And it's because the information was enough in front of them, just as I think the argument is here, that Deutsche Bank was perfectly aware of what Hezbollah was doing. Deutsche Bank was perfectly aware of what Iran's relationship to Hezbollah was. So, I mean, people have criticized the criminal law of conspiracy. Don't get me wrong, but it is what it is. And so why are you further away from the conspiracy than my drug storage person is? Your Honor, I think what's important to recognize in these conspiracy cases is that knowledge is not sort of the be-all, end-all. What it is is it's a basis for inferring. So I think in your drug case, when someone agrees to store these mysterious boxes for a lot of money, there's no real explanation of that other than I think it's very easy at least for a jury to draw an inference there that, yeah, this is a drug transaction. And you have agreed to help out with a drug operation. I think you could make a similar argument here in terms of an agreement to evade sanctions. You know, in the Owens case, unlike here, there's actually a guilty plea to a conspiracy to evade sanctions. So I think you can get there. But when Deutsche Bank is agreeing to do, as you called it, deceptive banking for Bank Malley and Bank Sederet at a time that those banks are not designated as SDNs, they're not designated as SDGTs, you know, the knowledge that Iran in general is doing very bad things, I don't think under the set of facts that's enough for that knowledge of what Iran is doing generally is a conspiracy. Because if you can get there, you know, anything you do with Iran, you know, if you were putting money into Iran's coffers and you say, well, but you know that Iran is bad. You know Iran is doing bad things. Then anyone who's doing business with Iran, anyone who's sending money to Iran is conspiring to fund terrorism. And I think that would be a very— Yeah, so I had a hypothetical for your opponent about that. Suppose, you know, you're taking your annual summer vacation in Paris, which regrettably I'm not doing anymore, but I did for a while. And you go to the local Monoprix and you buy a bag of pistachios, and they come from Iran, as many of them do, in fact. So you've sent money to Iran, and so the question is, have you become a conspirator? You know, it says on the package, you know, produced in Iran. Right, and you know, I'm eager to hear the answer to that hypothetical as well. But I think as a principled matter, if the theory is just you are contributing resources to a state sponsor, knowing that that state sponsor sponsors terrorism, if that's the theory, then I do think it becomes very difficult to draw that line. Your Honor, if I could talk for a moment— I wanted you to get into A&D. Sure. I think— My God, it sounds like a medication. Your Honor, I heard Professor Ravenhansen say that, you know, they plan, you know, if this goes back, they think that a fact finder could find either an A claim or a D claim. So I think we should be precise about what claims are left in this case. In the district court, after JASTA was passed, the plaintiff explained that she had a claim under D for the express statutory cause of action for conspiracy. The district court, this is at Addendum 3, Note 1, held that the plaintiff had not stated a claim under D, and certainly in the opening brief, there was no challenge to that. So a D claim is out of the case. There is no— Congress created an express claim for conspiracy liability, and that is now out of the case. And that was because of the failure to allege a more direct conspiracy with a foreign terrorist organization? Was that the D problem? Your Honor, to establish a claim under D, you need to show first that there was an act of terrorism that was planned, authorized, or committed by a foreign terrorist organization. And once you've established that, you need to show that the defendant conspired with the person who committed the terrorist organization. What the district court found was, what they said was a— what they alleged was a conspiracy with Iran. Iran was not the person who committed. And that has not been challenged. So this is not that case, I suppose, because it's been dropped. Right, that has been dropped. And so now we have the question that I think Judge Rovner raised at the beginning. We know that Congress created this express cause of action for conspiracy. We also know that it had these limitations. It has this planned, committed, and authorized element. It has this conspire with the person who committed element. And so what the plaintiff is arguing here is, even if we can't satisfy the express conspiracy claim, we get it anyway. You can read it in through a chain of incorporations by reference into 2333A. And I just don't think that's a— And is it Voim your problem there? I mean, because one of the issues in Voim— we entertained that case a couple of times— was, since the language of the statute is so open-ended, the question was, how far out do you go? And we did say, you know, it didn't—in that instance, that was whether Holy Land was actually funding the precise people who helped the defendant or the victim of the terrorism, David Voim. And so how much further out? And actually, it's a pretty loose— I complained about this in my dissent— it's a pretty loose causation standard in Voim. And if that's the law, then why isn't it met here? Your Honor, I think it is not so loose that we can go away from, you know, material support for the terrorists to— I think five or six times in the complaint, what they call this case is it's a case about material support to Iran. And so it's this idea— That's why I was saying, you know, so if Iran is effectively the terrorist, if the government of Iran has dedicated itself to being the supervisor of terrorism against the United States in that region of the world, why doesn't that get close enough to Voim to survive 12B6? Your Honor, I think— I don't think that, you know, calling Iran just a terrorist is enough when Iran is a sovereign government. We don't recognize it as a government, right? You know, it's an unrecognized state. Well, I think we recognize the existence of the state. We certainly have our problems with it. And that's not in dispute here. It's not on the State Department's list. That's what I mean. Iran is a bad regime. I think we can stipulate to that here.  I don't think Rothstein and Owens ever disagreed with Voim. It's a limitless causation idea, but we're going to go a different way. I think these are fundamentally different cases. Voim was about support for terrorism, for Hamas, either directly or through known fronts. Rothstein, Owens in this case, these are essentially about, what the plaintiff said in her complaint, material support for Iran. And in our view, that is just too big a leap. However broad Voim 3 is read to go, I don't think it goes— it doesn't go that far. And can you explain, just to tie this off, because I know Mr. Ravenhansen is going to come back to this, why the conspiracy notion doesn't cure those problems? Because if everybody's in one big agreement to commit terrorist acts against American service people or against Americans in general, then we can get to the murder of the plaintiff's son. Your Honor, if plaintiff had preserved and could plead a claim under subsection D and could meet all those elements, then that's exactly where we would go. We would apply all of these normal civil conspiracy principles. But they're not doing that. They're reading it in to A. And essentially, they call it Pinkerton causation in their brief. But I don't think that's causation. That's just conspiracy law, this idea that even if you didn't cause it, you were essentially liable for what your co-conspirators do. If you see a claim under A following Boehm 3, we agree they're entitled to use a conspiracy to support terrorism, a conspiracy to commit material support for terrorism. That can check one box in their chain of incorporations by reference. That is essentially their predicate crime, the way 2339A, material support, was the predicate crime in Boehm 3. Here it is the conspiracy prong, sort of one step removed further, from the same statutory section. So we agree that they've pled that, but let's say they have. They've checked that box. The question is still, this is primary liability. Did Deutsche Bank's actions cause, approximately cause, the plaintiff's injury? And here we'd submit there are not sufficient allegations to show that. Your Honor, if I could spend one minute in my remaining minute just to make a point about the reason for affirming here, although it was not reached by the district court. Because this is a primary liability claim, that's not disputed. You need to meet all the elements that Congress laid out. One is that the defendant itself needs to appear to have intended to intimidate and coerce. So even if you accept that because Deutsche Bank knew, because Deutsche Bank knew essentially that Iran was bad, you could sort of infer that an objective observer on the alleged facts would conclude that what Deutsche Bank's intent here was, was not to make money, was not to have a lucrative business, but was to intimidate. Can I quickly ask you before you run out of time, what about recklessness? What if Deutsche Bank were recklessly causing those problems to arise? Your Honor, They're not sitting there thinking we'd like Americans killed, but they're like, an objective observer needs to, needs to conclude that it appears that the defendant here, the defendant itself, intended to intimidate and intended to coerce. And in Boeing 3, that was quite easy to establish because you had a knowing donor to Hamas. A jury could certainly reasonably infer from that that you were essentially buying in to Hamas's underlying goals. And we just don't have that here. Thank you, Your Honor. All right, thank you. Mr. Evan Hansen. Thank you. A few quick points. The United States v. Chem was one of the drug conspiracy cases to which I think Your Honor alluded. And there, a lawyer set up a corporation that purchased airplanes and was charged with conspiring to distribute drugs because the planes were used for that purpose. And his argument was he had no idea that they were going to be used for that, much like the bank's argument that they had no idea how this money would be spent. And this court held that if there was a high probability, he knew of a high probability that the money would be used for that purpose, then he was chargeable with joining the conspiracy and with the acts that it took. Your Honor asked about pistachio purchases. There is no course of dealing in your pistachio purchase example. Here, the bank— But the point for that example, and actually I could even give you another one, is that if you are someplace— I had to make it in Paris because there's been enough of an embargo of Iranian goods that our pistachios tend to be from California. But you are helping Iran by purchasing products. The profits from those sales flow back to Iran. If you were Deutsche Bank, suppose it's a shareholder of Deutsche Bank who lives anywhere. Is that shareholder of Deutsche Bank also responsible for these acts, in your view? No, he wouldn't be. Is there being enriched by these same transactions? No, he wouldn't be. But the bank here engaged in a course of dealing— Why not? Why isn't the shareholder responsible? Because the consent and the intent is inferred here from the course of dealing from an extended association with a give-and-take with Bank Saderat and Bank Mellai where the bank actually ends up marketing what it calls, quote-unquote, and your shareholder are not engaged in that course of dealing. And it's common drug conspiracy law that we can infer the necessary consent or intent or state of mind from that kind of course of dealing. Also, I would point out that if your honors look at Joint Appendix, page 69, paragraph 25 of the consent order, you'll see that when the bank's New York officers raised questions about what it was doing, the questions were not about rejecting sales and kind of complying with the paperwork requirements. The questions were about dealing with U.S.-sanctioned customers and having relationships with U.S.-sanctioned customers. And we think that brings it much closer to an inference that they are knowingly dealing with material support. I'd also note the statute actually has two alternative standards for conspiracy here. One is conspiracy to provide evidence, but the other is a conspiracy to conceal or disguise the source or ownership of material support. The district court completely failed to apply that standard, and that fits like a glove what the bank has been doing here. Finally, as to the JASTA claim, I want to add it is before the court because the mistake that Judge Reagan made on the JASTA claim was in defining the scope of the conspiracy, and that's the first issue that we present in our brief here. If the scope of the conspiracy is as we've described it, then the lower court was wrong on the JASTA claim as well. In paragraph 139 of our complaint, we allege that one of the co-conspirators is the IRGC, whose terror arm is IRGCQF. So they are alleged to be in the conspiracy, and of course it's common conspiracy law that the bank doesn't have to deal directly with them as long as they are part of the conspiracy, and acts that they take aren't further into the conspiracy. Thank you. Thank you very much. Thanks to both counsel. We will take the case under advisement.